IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA

v.

ISAIAS REFUGIO RODRIGUEZ,

Defendant.

CRIMINAL CASE NO.

1:10-CR-0407-TWT-JFK-3

## REPORT AND RECOMMENDATION

Pending before the court is Defendant Isaias Refugio Rodriguez's motion [Doc. 38] to suppress.[1]  Defendant seeks to suppress evidence, over $700,000 in U.S. currency (thirty-seven $20,000 bundles), seized following a traffic-stop from the trailer attached to the tractor he was driving.  In the motion to suppress, Defendant contended that he was an aggrieved person due to the fact that he was unlawfully detained, that "defendant's vehicle" was searched without justification and that he did not voluntarily

---

[1]Defendant Marco Antonio Alfarro-Rivera has not been apprehended, and Defendant Eduardo Humberto Recio, III, has entered a plea of guilty and been sentenced.

AO 72A
(Rev.8/82)

consent to the search of the trailer.  [Id.].  An evidentiary hearing was held on the motion to suppress on July 13, 2011.[2]  [Doc. 55].

In his post-hearing brief, Defendant's only attack on the seizure of the evidence is based on a challenge that his consent to search the trailer was not valid as he did not have authority to consent.  The issue before the court as stated by Defendant is: "Whether the Defendant had the authority to consent to a search of a trailer the Defendant did not own, have joint control over, access to, or interest in, in light of the Officers [sic] knowledge that the load was owned by a third party, thereby making the search unreasonable and the monies seized subject to suppression?"  [Doc. 63 at 2].  Defendant has apparently abandoned any other grounds for challenging the seizure of the currency from the trailer.  See United States v. Zekic, 2010 WL 4962985, at *1 (N.D. Ga. October 28, 2010) (citing Access Now, Inc. v. Southwest Airlines Co., 385 F.3d 1324, 1330 (11th Cir. 2004) ("[T]he law is by now well settled in this Circuit that a legal claim or argument that has not been briefed before the court is deemed abandoned and its merits will not be addressed.")), adopted by 2010 WL 4967825 (N.D. Ga. December 1, 2010).  And, as the Government correctly points out, Defendant's contention that he lacked authority to give a valid consent to search the

_____

[2]Citations to the hearing transcript are:  (Tr. at ).

2

trailer - basically lacking any expectation of privacy in the trailer or the contents of the trailer - indicates that Defendant cannot challenge the search of the trailer on Fourth Amendment grounds. [Doc. 64 at 11]. The Government also persuasively argues in the alternative that there was probable cause for the search or that, following a lawful traffic-stop, Defendant voluntarily consented to the search of the trailer. [Id. at 12-17].

After consideration of the totality of the circumstances and the parties' legal arguments, the court recommends that Defendant's motion to suppress be denied.

## II.    Facts

In 2008, agents with the Drug Enforcement Administration ("DEA") began an investigation into a Mexican drug cartel that was transporting drugs from Mexico, through Laredo, Texas, for distribution in the Atlanta, Georgia, area. (Tr. at 4-5). The drugs were transported to Atlanta by tractor-trailers. (Tr. at 5). After the drugs were sold and the proceeds from the sales collected, the drug proceeds were transported, via tractor-trailer, back to Laredo, Texas, and then into Mexico. (Tr. at 5). Court authorized wire intercepts were utilized during the investigation. (Tr. at 5-6). As a part of the investigation, in September 2008, law enforcement seized from a tractor-trailer over $1,000,000 in drug proceeds, and in two separate seizures in December 2008, agents seized from tractor-trailers approximately $10,000,000. (Tr. at 6).

On April 12, 2010, as part of the investigation, targets of the investigation, Marco Alfarro-Rivera, the Atlanta-based transportation manager for the cartel, and Elbert Figueroa and Jose Tobias, Laredo-based transportation managers for the cartel, were intercepted discussing the arrival of two tractor-trailers in Atlanta for the purpose of being loaded with drug proceeds for shipment to Laredo, Texas.[3]  (Tr. at 7-9, 20). Alfarro-Rivera also had intercepted conversations with Eddie Cisneros, who worked for Alfarro-Rivera, about contacting "Isaac" regarding the time of his arrival with one of the tractor-trailers.  (Tr. at 8-9).   Alfarro-Rivera then contacted Chivito, who managed the automotive warehouse located at 2332 Simpson Circle, in Norcross, which had been used by the cartel to off-load cocaine transported to Atlanta on the tractor-trailers and to load U.S. currency onto the tractor-trailers for shipment to Laredo, advising that the tractor-trailer would arrive the next day.  (Tr. at 9-10, 20). Alfarro-Rivera then called Chivo, identified as a "cell head" responsible for receiving and distributing the cocaine in Atlanta and collecting the proceeds from the sales, to

---

[3]The men used code for the drugs, monies and tractor-trailers in their discussions that the agents' interpreted based on their experience in the investigation.  (Tr. at 8-15).

advise that the proceeds should be brought to the warehouse for loading on the tractor-trailer the next day.[4]  (Tr. at 10-11).

On April 13, 2010, agents established surveillance at the warehouse.  (Tr. at 11).  Additional calls were intercepted the morning of April 13, 2010, including between Alfarro-Rivera and Isaac, the driver of the tractor-trailer and later identified as Defendant Rodriguez, in which Defendant advised that he left late, was seven hours away, and would be arriving late in the day.  (Tr. at 11-12, 22-23).  During the conversations, Defendant advised that he was carrying "bacon and meat boxes" for Alfarro-Rivera's inspection, indicating to the agents that he was driving a refrigerated trailer.  (Tr. at 12, 21).  Defendant also mentioned that the last time he had made the trip, he arrived at sundown and that everything had gone okay.  (Tr. at 12, 23).  Based on the investigation, the agents were aware that the tractor-trailer had originated in Laredo, Texas, and was traveling from somewhere in either North or South Carolina to Atlanta.  (Tr. at 20-21).

---

[4]During an intercepted conversation the morning of April 13, 2010, between Alfarro-Rivera and Chivo, Chivo stated there would be "three seven," which based on prior seizures of U.S. currency and intercepted conversations, the agents understood to be thirty-seven bundles of U.S. currency.  (Tr. at 12-13).

AO 72A
(Rev.8/82)

At approximately 5:32 p.m., surveillance agents observed a white tractor-trailer hauling a refrigerated unit, with Texas plates and registration, bearing the logo, "Tobias Trucking Co.," arrive at and back into the warehouse.[5]  (Tr. at 13-14).  The agents could not see the back end of the trailer, but they did observe the driver, a Hispanic male, wearing an orange shirt - again, later identified as Defendant.  (Tr. at 14-15, 18).   The tractor-trailer, under constant surveillance by agents, left the warehouse at approximately 8:00 p.m. (Tr. at 14).  At 8:37 p.m., the agents intercepted a conversation between Tobias and Cisneros in which Cisneros advised Tobias that the "man had left a little while ago and everything was calm."  (Tr. at 15).

The agents followed the tractor-trailer on I-85 south.  (Tr. at 15-16).  Agents, who had previously contacted Georgia State Patrol ("GSP") Sergeant Blake Swicord,[6]

---

[5]At that time, the agents learned that the truck was registered to Jose Tobias, one of the targets of the investigation.  (Tr. at 14).

[6]Sgt. Swicord, who has been a GSP trooper for ten years, is the supervisor of the GSP's Criminal Interdiction Unit which is responsible for special operations targeting the interstate systems around Atlanta.  He's been in the Unit since 2003.  (Tr. at 30-31).  The Unit looks for criminal activity, focusing on drug trafficking.  (Tr. at 30). The sergeant's training and experience includes six additional years as a deputy with the Baldwin County Sheriff's Department, being a state and federal instructor for the Drug Interdiction Association Program and teaching classes around the United States, and he has testified as an expert witness in federal court in Atlanta, South Carolina and Texas on the topic of commercial motor vehicle drug trafficking and money laundering.  (Tr. at 31).

advised Sgt. Swicord of the description of the tractor-trailer and requested that he

conduct a traffic stop if he could develop probable cause.  Sgt. Swicord had been given

an overview of the drug investigation and understood that the agents believed that the

tractor-trailer was carrying an undetermined amount of U.S. currency which was the

proceeds of drug sales and destined for the border in Texas.[7]  (Tr. at 16-17, 24-25, 27,

31-33, 73-74).  Once Sgt. Swicord identified the tractor-trailer, he began following and

observing its operation.  The vehicle was traveling southbound on I-85, using the left

hand lane of the two lane interstate.  (Tr. at 33-34, 75).  Sgt. Swicord was traveling in

the right hand lane slightly behind the tractor-trailer, but he was able to see the vehicles

in front of the tractor-trailer.  (Tr. at 34-35, 37).  He observed that the tractor-trailer,

which was traveling 65 to 75 miles per hour, was less than two car lengths behind the

passenger vehicle in front of it.  (Tr. at 34-35, 76-78).  Because there should be one car

length for every 10 miles per hour, the tractor-trailer was following too close, a

violation of O.C.G.A. 40-6-49.  (Tr. at 34, 77-78).

---

[7]The agents asked Sgt. Swicord to conduct a "whisper or wall-off" traffic stop
due to the ongoing nature of the drug investigation.  (Tr. at 16-17).  Sgt. Swicord
advised that such stops are made having prior suspicion of criminal activity and that,
during the stop, he determines whether he independently believes there is criminal
conduct involving the motor vehicle.  (Tr. at 74).  A "cold stop" does not involve any
advance notice of potential criminal activity.  (Tr. at 74).

7

Sgt. Swicord conducted a traffic stop by activating blue lights on his marked patrol vehicle.[8]  (Tr. at 35, 77).  At approximately mile marker 22, in Troup County, Georgia, the tractor-trailer pulled over into the emergency lane, against a guard rail. (Tr. at 33, 35).  According to Sgt. Swicord, this presented an unsafe condition due to the traffic on the interstate, so after obtaining the driver's, that is, Defendant's, identification and drivers license and advising Defendant of the reason for the traffic stop, he asked Defendant to drive up to the nearby weigh station and to pull off the interstate.  (Tr. at 35-37).  Defendant's demeanor during this time was normal, and he complied with the sergeant's requests.  (Tr. at 36).

After arriving at the weigh station, which was approximately six minutes and thirty seconds after initially stopping the tractor-trailer, Sgt. Swicord asked Defendant to produce the paperwork which is required to be maintained for a commercial motor vehicle, that is, the logbook, which records the travel and time of operation by the driver; the permit book, which provides the registration and authority for operation; insurance; CDL license; medical card; and bill of lading, which is the receipt for the

---

[8]The traffic stop was video and audio recorded.  (Tr. at 37-38; Gov't Ex. 1).

AO 72A
(Rev.8/82)

commodity being transported.[9]  (Tr. at 39).  Obtaining and reviewing these documents is normal procedure for a traffic stop involving a commercial motor vehicle.  (Tr. at 40).  Sgt. Swicord examined the last seven days documented in the logbook, as is required to be maintained, and noted that before making the trip from Laredo, Texas, Defendant had taken several days off, which is not normal operating procedure.  (Tr. at 40-41).  Having also noted that the trucking company was fairly new due to the high D.O.T. number and was small, operating only three trucks, the time off was especially suspicious to the sergeant because the truck must be in operation for the company - and Defendant, who received a commission on the loads transported - to make any money.  The logbook indicated that Defendant had transported a load of tomatoes from Laredo to Pennsylvania, and the bill of lading indicated that he picked up a load of twenty-six pallets of pork hams in Smithfield, Virginia.  (Tr. at 41-42, 49, 82, 84).  This was a fairly common load for interstate transportation, and Sgt. Swicord had conducted hundreds, if not thousands, of traffic stops involving commercial motor vehicles transporting these loads.  (Tr. at 42).

---

[9]Sgt. Swicord's partner, Trooper Ray Malone, was present for safety; however, he did not participate in the examination of the paperwork or discussion with Defendant and was not standing near Defendant.  (Tr. at 50).

9

Upon examining the bill of lading and the seal[10] on the rear doors of the tractor-trailer, the sergeant observed a number of inconsistencies from normal operating procedures.  As the trailer is loaded, the dock supervisor and driver typically watch the loading, and at Smithfield, a computer-generated seal is placed on the bill of lading and on the trailer.  (Tr. at 43-44).  On the bill of lading produced by Defendant, the computer-generated seal from the loading dock was marked through with an ink pen and a handwritten seal placed above it.  (Tr. at 44).  On the trailer, a "generic seal,  . . . a keller seal, had been placed on there."  That type of seal can be purchased at any truck stop.  (Tr. at ).  And the seal is not used by Smithfield.  (Tr. at 44).  Based on these observations, Sgt. Swicord believed that someone had been inside the trailer since it left the Smithfield loading dock.  (Tr. at 44).  Sgt. Swicord advised Defendant of his observations about the seal and bill of lading.  (Tr. at 46).

While examining the logbook, Sgt. Swicord noted that Defendant had not noted any stops in Atlanta, although the sergeant was aware from the agents that Defendant had stopped at the warehouse.  (Tr. at 46).  Defendant only noted a stop for fuel in

---

[10]The seal verifies to the owner of the commodity loaded on the trailer that the dock supervisor inspected and verified the load and that the load was in good order and matched the information on the bill of lading.  If the seal is not broken when it arrives at the destination, the owner knows the commodity has not been tampered with and that neither the driver nor anyone else has been in the trailer.  (Tr. at 43).

Carnesville, near Toccoa, Georgia, on I-85.  Based on the normal trip time from that location to the point of the traffic stop, Sgt. Swicord estimated that approximately four hours was not accounted for in the logbook.  (Tr. at 46, 79-80).  When Sgt. Swicord asked Defendant about the delay, Defendant did not advise that he stopped in Atlanta, and he had no explanation for the extra travel time.  (Tr. at 47, 80).  These facts also were of interest to the sergeant, especially due to the fact that Defendant, an experienced truck driver,[11] knew he could be penalized with ten hours off for failing to document all stops.  Sgt. Swicord stated that this "lends credence to he knows he was doing something he shouldn't be doing, that's the reason that he didn't write it down there."  (Tr. at 49).  Sgt. Swicord also noted that the trailer doors had a titanium bolt seal which would require bolt cutters to remove and would prevent a law enforcement officer without bolt cutters from getting into the trailer.  (Tr. at 45).  However, the sergeant had bolt cutters with him.  (Tr. at 45).

Sgt. Swicord communicated for the most part with Defendant in English, using some Spanish to be sure Defendant understood.[12]  (Tr. at 47).  He also testified that in

---

[11]Based on his discussion with Defendant, Sgt. Swicord determined that Defendant was an experienced driver.  (Tr. at 48).

[12]Sgt. Swicord testified that, although he had classes in Spanish, he was not proficient but could communicate sufficiently to speak Spanish in connection with his

order to have a CDL license, as Defendant did, Defendant had to understand English. (Tr. at 40). During this conversation, Defendant stood in front of the patrol vehicle; he was not handcuffed or otherwise restrained. (Tr. at 48). As the sergeant spoke to Defendant about his observations, Defendant became more nervous - Sgt. Swicord believed due to the fact that Defendant was not providing a legitimate explanation about the seal or his travel. (Tr. at 48). At approximately sixteen minutes and forty-five seconds into the stop, Sgt. Swicord returned to his patrol vehicle to run routine computer checks on Defendant's license and on the trucking company, checking for any prior criminal activity. (Tr. at 50-51). Sgt. Swicord also tried to contact the Smithfield dock to check on the seal, but as he suspected would be the case, he was not successful. (Tr. at 50-51, 82). He completed these background checks, which were negative, in approximately eight to ten minutes. (Tr. at 51).

He exited his patrol vehicle and approached Defendant, who remained standing unrestrained in front of the vehicle. (Tr. at 51-52). He provided Defendant with a warning for following too close and returned all of Defendant's documents and paperwork to him. (Tr. at 52; Gov't Ex. 2). The traffic stop was completed. (Tr. at 52). Sgt. Swicord then explained to Defendant his suspicions about the seal and

duties. (Tr. at 54).

AO 72A
(Rev.8/82)

immediately asked in English for Defendant's consent to search the tractor-trailer. (Tr. at 52, 54). Defendant responded, no problem. (Tr. at 54). This was approximately thirty minutes from the start of the traffic stop. (Tr. at 53). The sergeant handed Defendant two versions of the consent form, one in English and one in Spanish, because Defendant had stated that he could read both languages. (Tr. at 53-55; Gov't Exs. 3 and 4). The handwritten part of both forms, which identified the trailer as being included in the search, was added by Sgt. Swicord before he handed the forms to Defendant to read.[13] (Tr. at 55-56). Sgt. Swicord told Defendant to read both forms and that if he understood the forms and did not have a problem with the search, to sign the forms. (Tr. at 53-54, 57).

The English version of the form states:

I, Isaias Refugio Rodriguez, hereby grant my consent to Swicord, Kendel Blake, and Ray Malone, Troopers of the Georgia State Patrol, to search the following described vehicle including luggage, containers and contents of all. This includes the removal of any suspicious paneling or other vehicle components and the least intrusive access to any constructed compartment used for the purposes of concealing contraband.

Year would be a 2002 Freightliner. Be a model, tractor. White in color.

_____

[13]The computer generated forms had typed in the information for the tractor. (Tr. at 55; Gov't Exs. 3 and 4).

AO 72A
(Rev.8/82)

> The trailer would be a 1991 utility trailer.  Tag, X-ray 35061.  Tractor tag would be Texas X-ray 35061.
>
> I understand that I have the right to refuse to consent to the search described above and to refuse to sign this form.  I further state that no promises, threats, force, physical or mental coercion of any kind whatsoever have been used against me to get me to consent to the search described above or to sign this form.
>
> My consent is freely and voluntarily given.

(Tr. at 56-57; Gov't Ex. 4).[14]

Sgt. Swicord moved away from Defendant so he would not appear to be hovering over Defendant.  (Tr. at 59).  Defendant appeared to read the forms and then at 10:30 and 39 seconds on April 13, 2010, he signed both forms.  (Tr. at 57-58). Defendant did not appear to have a problem understanding the forms, and he did not indicate that he did not want to sign the forms.  (Tr. at 58-59).  Defendant appeared to be intelligent and did not appear to be under the influence of drugs or alcohol.  (Tr. at 59).  Sgt. Swicord did not make any promises or threats to obtain the consent.  (Tr. at 59).  No weapons were drawn, and the tone of the conversation was business-like.  (Tr. at 59-60).  After providing Defendant with a copy of the Spanish version of the consent

---

[14]Sgt. Swicord has been advised by legal counsel for GSP that the English form is a translation of the Spanish version of the form.  (Tr. at 57).

14

to search form, as requested by Defendant (a request that no one had ever made before), the search started.[15]  (Tr. at 60).

Trooper Malone conducted the search of the tractor, while Sgt. Swicord, who believed contraband was in the trailer, searched the trailer.  (Tr. at 61).  After cutting off the bolt, Sgt. Swicord climbed into the trailer.  (Tr. at 61).  Because of the refrigeration, there was a light frost on the boxes of pork hams.  (Tr. at 61-62).  Sgt. Swicord examined the top of the boxes with a flashlight and observed knee marks and footprints in the frost; however, given the industry practice for loading the boxes from the front of the trailer to the back, there was no reason for anyone to have been on top of the boxes.  (Tr. at 62).  Added to the fact that the seal had been cut, he believed that contraband had been inserted into the legitimate load of pork hams.  (Tr. at 62).  He had seen this with drugs and currency.  (Tr. at 62).  After crawling over the boxes, Sgt. Swicord did not see anything stuffed among the boxes but did observe that about mid-way to the front of the load the knee marks and footprints stopped.  (Tr. at 63).  Because the 680 boxes were mashed together and extremely heavy, banded and sealed,

---

[15]A third trooper, Jimmy Jones, arrived for safety while the other two troopers conducted the search.  (Tr. at 61).

it was not possible to examine each box at the weigh station.  (Tr. at 62-64).  He needed a forklift and pallet jack.  (Tr. at 64).

Sgt. Swicord explained to Defendant what he had observed in the trailer, and Defendant acted like he did not know anything; however, he became more nervous. (Tr. at 62, 64-65).  He asked Defendant to follow the troopers to the WalMart Supercenter, which had a loading dock and was located at the next exit, so that he could quickly and efficiently remove and examine the load without any spoilage.  (Tr. at 64-66).  This request came approximately one hour after the initial stop and about thirty minutes after Defendant gave consent.  (Tr. at 65).  Defendant agreed and drove the tractor-trailer to the WalMart.  (Tr. at 66).  Defendant backed the trailer up to an open loading dock.  (Tr. at 66).  The sergeant advised Defendant that he would unload and check the boxes as quickly as possible, and that, if nothing was found, the trailer would be reloaded and Defendant could leave.  (Tr. at 66).  He told Defendant that he would document on the bill of lading that he had inspected the load and then would reseal the load.  (Tr. at 66).

Sgt. Swicord unloaded the boxes of pork hams from the trailer and examined each box.  (Tr. at 67-68; Gov't Exs. 8 and 9).  He noticed inconsistent marking on one box.  All of the boxes except one had an ink mark and a Smithfield receipt tape.  (Tr.

16

at 68).  When the sergeant examined the opening in the box, used as a handle, he observed bundled packages, which based on his experience, he knew contained U.S. currency. (Tr. at 68).  There were thirty-seven $20,000 bundles of U.S. currency. (Tr. at 68; Gov't Ex. 10).  Defendant had sat on the dock watching.  Sgt. Swicord called Defendant over to show him the currency, and Defendant denied knowing anything about the bundles.  (Tr. at 68-69).  He stated that he was not the owner of the currency and executed a document disclaiming ownership.  (Tr. at 69-70; Gov't Ex. 5).  Sgt. Swicord reloaded the trailer, closed and resealed the trailer, and documented the bill of lading.  Defendant then left.  (Tr. at 70).

Additional facts will be set forth as necessary in discussion of Defendant's motion to suppress.

## II.     Discussion

### a.      Expectation of Privacy

As noted, although Defendant contended that he was the owner of the trailer and was an aggrieved person in his motion to suppress, Defendant now contends that he had no authority to consent to the search because he "did not own, have joint control over, access to, or interest in" the trailer or its contents.  [Docs. 38 and 63].  To determine whether an individual may challenge a search, the court must decide

17

"whether the individual maintains a legitimate expectation of privacy in the object of the search."  United States v. Hastamorir, 881 F.2d 1551, 1559 (11th Cir. 1989).

It is Defendant's burden to prove that he has a legitimate expectation of privacy in the object of the search, that is, the tractor-trailer on April 13, 2010.  See United States v. Cooper, 203 F.3d 1279, 1283-84 (11th Cir. 2000).  Making this determination involves a two-part inquiry:  (1) "whether the individual has manifested 'a subjective expectation of privacy in the object of the challenged search[,]' . . . [and (2)] whether society is willing to recognize the individual's expectation of privacy as legitimate." Hastamorir, 881 F.2d at 1559 (citation omitted).  In this regard, "[t]he Supreme Court has held that '[a] person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed.'"  United States v. Brown, 743 F.2d 1505, 1506 (11th Cir. 1984) (quoting Rakas v. Illinois, 99 S. Ct. 421, 425 (1978)).  Thus, "'in order to claim the protection of the Fourth Amendment, a defendant must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable. . . .'"  United States v. Chaves, 169 F.3d 687, 690 (11th Cir. 1999) (citation omitted).

18

Additionally, "[l]egitimate expectations of privacy can be abandoned." United States v. McKennon, 814 F.2d 1539, 1545 (11th Cir. 1987).    The question of abandonment is one of intent "which can be inferred from words, acts and other objective facts." Id. at 1546; see also United States v. Cofield, 272 F.3d 1303, 1306 (11th Cir. 2001). "[T]he critical inquiry is 'whether the person prejudiced by the search . . . voluntarily discarded, left behind, or otherwise *relinquished his interest in the property* in question so that he could no longer retain a reasonable expectation of privacy with regard to it *at the time of the search*.'" McKennon, 814 F.2d at 1546 (quoting United States v. Pirolli, 673 F.2d 1200, 1204 (11th Cir. 1982)) (emphasis in original).  In making this determination, "events that occurred after the abandonment may be considered by the court as evidence of the defendant's intent to abandon the property at the previous time." United States v. Winchester, 916 F.2d 601, 604 (11th Cir. 1990); accord United States v. Walker, 199 Fed. Appx. 884, 886 (11th Cir. 2006) (same).  The abandonment cannot be the result of unlawful government conduct. See United States v. Jones, 619 F.2d 494 (5th Cir. 1980).  As noted, the defendant has the burden of establishing a legitimate expectation of privacy; however, the Government has the burden of proving abandonment. Walker, 199 Fed. Appx. at 886 (citing United States v. Ramos, 12 F.3d 1019, 1023 (11th Cir. 1994)).

19

Defendant has disclaimed any legitimate expectation of privacy in the trailer or its contents.  The position taken in his post-hearing brief - triggered by no action taken by the Government - makes clear that whatever interest Defendant may have had in the trailer and its contents has been waived or abandoned.  He therefore cannot challenge on Fourth Amendment grounds the search of the trailer or the seizure of the currency. The motion to suppress should be denied on this basis.

### b.    Search of Trailer

Even if Defendant had a legitimate expectation of privacy in the trailer, the search of the trailer and seizure of the currency did not violate his Fourth Amendment rights.  As noted, Defendant made a number of attacks on the traffic stop, his detention, and the consent to search in his motion to suppress [Doc. 38]; however, the only challenge that Defendant raises to the search and seizure in his post-hearing brief is a claim that he did not have the authority to consent to the search - a claim *not* made in the motion [Doc. 63].  The Government argues, even if Defendant did not have authority to consent to the search, because there was probable cause to search the tractor-trailer, consent is immaterial, and the search is lawful.  [Doc. 12-13].  The Government is correct.

20

As a general rule, the Fourth Amendment requires police officers to obtain a warrant before conducting a search.  See California v. Carney, 105 S. Ct. 2066, 2069 (1985).  In Carroll v. United States, 45 S. Ct. 280, 285 (1925), the Supreme Court established an exception to the warrant requirement for searches of automobiles and other moving vehicles.  Under the "automobile exception," "[i]f a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment . . . permits police to search the vehicle without more." Pennsylvania v. Labron, 116 S. Ct. 2485, 2487 (1996); see also United States v. Lindsey, 482 F.3d 1285, 1293 (11th Cir. 2007) ("The requirement of mobility is satisfied merely if 'the automobile is operational.'") (citation omitted).  No separate exigent circumstances need to be shown.  See Maryland v. Dyson, 119 S. Ct. 2013, 2014 (1999); Lindsey, 482 F.3d at 1293 (noting there is no requirement that the search occur contemporaneously with the vehicle's seizure or that any other exigent circumstances exist); United States v. Watts, 329 F.3d 1282, 1286 (11th Cir. 2003) ("[T]his Court made it 'clear that the requirement of exigent circumstances is satisfied by the ready mobility *inherent* in all automobiles that reasonably appear to be capable of functioning.'") (citation omitted) (emphasis in original).

21

There is no dispute that the tractor-trailer was readily mobile on April 13, 2010. The vehicle had traveled from Virginia, through Atlanta, and was traveling southbound on I-85 when the traffic stop occurred. (Tr. at 14-16, 33-34, 42). The vehicle also traveled from the point of the initial stop to the weigh station and then to the WalMart Supercenter. (Tr. at 35, 64, 66). The validity of the search, therefore, turns on whether there was probable cause to believe the vehicle contained contraband or evidence of a crime. Dyson, 119 S. Ct. at 2014; see also Lindsey, 482 F.3d at 1293 ("The key issue here is whether the police had probable cause for the search and seizure of the vehicle."). "Probable cause for a search exists when under the totality of the circumstances there is a fair probability that contraband or evidence of a crime will be found in a particular place." United States v. Magluta, 418 F.3d 1166, 1182 (11th Cir. 2005) (citations and internal quotation marks omitted).

The facts collectively known by the investigating agents, as supplemented by Sgt. Swicord's observations and discussions with Defendant during the traffic stop, established probable cause to search the trailer and its contents for drug trafficking proceeds. See United States v. Goddard, 312 F.3d 1360, 1363-64 (11th Cir. 2002) ("Observations and other information supplied by officers involved in a common investigation can, taken together, create probable cause for a search."); United States

22

v. Olmedo, 552 F. Supp. 2d 1347, 1356-57 (S.D. Fla. 2008) (court found that information known to investigative agent who provided overview of that information to officer asked to make stop of a vehicle is considered in determining whether probable cause exists for a search because the court "may examine the collective knowledge of the officers 'if they maintained at least a minimal level of communication during their investigation'") (citation omitted); United States v. Jackson, 548 F. Supp. 2d 1314, 1321 (M.D. Fla. 2008) (rejecting the defendant's contention that because officer effecting traffic stop was not aware of the wiretapped conversations, which were known to other investigating officers, that information could not be used in evaluating probable cause for the search and applying the collective knowledge of all of the investigating officers to find probable cause).

First, the investigating agents were aware of the ongoing DEA investigation of the Mexican drug cartel, which included the wire intercepts, surveillance and prior seizures of drug proceeds represented by millions in U.S. currency, an overview of which was provided to Sgt. Swicord. (Tr. at 16, 27, 31-33, 73-74). Beginning in 2008 and continuing in April 2010, utilizing court authorized wire intercepts, the DEA investigated a Mexican drug cartel that was transporting drugs from Mexico, through Laredo, Texas, for distribution in the Atlanta, Georgia, area using tractor-trailers for

transport.  (Tr. at 4-6).  After the drugs were sold and the proceeds from the sales collected, the proceeds were transported, via tractor-trailer, back to Laredo, Texas, and then into Mexico.  (Tr. at 5).  As a part of the investigation, in September 2008, law enforcement seized from a tractor-trailer over $1,000,000 in drug proceeds, and in two separate seizures in December 2008, agents seized from tractor-trailers approximately $10,000,000.  (Tr. at 6).

Second, the agents were aware of the intercepted conversations on April 12 and 13, 2010.  Specifically on April 12, 2010, targets of the investigation, Marco Alfarro-Rivera, the Atlanta-based transportation manager for the cartel, and Elbert Figueroa and Jose Tobias, Laredo-based transportation managers for the cartel, discussed the arrival of two tractor-trailers in Atlanta for the purpose of being loaded with drug proceeds for shipment to Laredo, Texas.  (Tr. at 7-9, 20).  Alfarro-Rivera also discussed with Eddie Cisneros, who worked for Alfarro-Rivera, about contacting "Isaac" regarding the time of his arrival with one of the tractor-trailers and contacted Chivito, who managed the automotive warehouse located at 2332 Simpson Circle, in Norcross, which had been used by the cartel to off-load cocaine transported to Atlanta on the tractor-trailers and to load U.S. currency onto the tractor-trailers for shipment to Laredo, to advise that the tractor-trailer would arrive the next day.  (Tr. at 9-10, 20).

24

Alfarro-Rivera then called Chivo, identified as a "cell head" responsible for receiving and distributing the cocaine in Atlanta and collecting the proceeds from the sales, to advise that the proceeds, thirty-seven bundles of currency, should be brought to the warehouse for loading on the tractor-trailer the next day. (Tr. at 10-13). And, on April 13, 2010, as the agents conducted surveillance at the warehouse, Alfarro-Rivera spoke with Isaac, the driver of the tractor-trailer subsequently identified as Defendant Rodriguez, who advised that he left late, was seven hours away, and would be arriving late in the day. Defendant advised that he was carrying "bacon and meat boxes" for Alfarro-Rivera's inspection, indicating to the agents that he was driving a refrigerated trailer. (Tr. at 11-12, 22-23). Defendant also mentioned that the last time he had made the trip, he arrived at sundown and that everything had gone okay. (Tr. at 12, 23).

Third, agents observed the arrival of the tractor-trailer as anticipated and its subsequent departure from the warehouse. At approximately 5:32 p.m., a white tractor-trailer hauling a refrigerated unit, with Texas plates and registration, bearing the logo, "Tobias Trucking Co.," registered to target Jose Tobias, arrived at and backed into the warehouse. (Tr. at 13-14). The agents could not see the back end of the trailer, but they did observe Defendant, a Hispanic male, wearing an orange shirt, standing outside. (Tr. at 14-15, 18). The tractor-trailer, under constant surveillance

25

by agents, left the warehouse at approximately 8:00 p.m. (Tr. at 14). At 8:37 p.m., the agents intercepted a conversation between Tobias and Cisneros in which Cisneros advised Tobias that the "man had left a little while ago and everything was calm." (Tr. at 15). The agents followed the tractor-trailer on I-85 south until Sgt. Swicord was able to identify and begin following the vehicle. (Tr. at 15-16, 32-33).

Fourth, if the above-outlined facts did not establish probable cause for the search, the additional observations of Sgt. Swicord while conducting the traffic stop corroborated and confirmed the DEA agents' belief that the drug proceeds were being transported in the tractor-trailer. Before discussing that additional information, and although not challenged by Defendant in his post-hearing brief, the court will briefly address the validity of the traffic stop and lawful detention of Defendant. "A traffic stop, which 'is a seizure within the meaning of the Fourth Amendment,' . . . 'is constitutional if it is either based upon probable cause to believe a traffic violation has occurred or justified by reasonable suspicion in accordance with Terry[v. Ohio, 88 S. Ct. 1868 (1968)].'" United States v. Spoerke, 568 F.3d 1236, 1248 (11th Cir. 2009) (citations omitted). As the Eleventh Circuit Court of Appeals stated in United States v. Cooper, 133 F.3d 1394 (11th Cir. 1998), "law enforcement 'may stop a vehicle when there is probable cause to believe that the driver is violating any one of the multitude

26

of applicable traffic and equipment regulations relating to the operation of motor vehicles.'"  133 F.3d at 1398 (quoting <u>United States v. Strickland</u>, 902 F.2d 937, 940 (11th Cir. 1990)); <u>see also</u> <u>United States v. Terry</u>, 220 Fed. Appx. 961, 963 (11th Cir. 2007) (same).  And "[w]hen determining whether an officer had probable cause to believe that a traffic violation occurred, the 'officer's motive in making the traffic stop does not invalidate what is otherwise objectively justifiable behavior under the Fourth Amendment.'"  <u>United States v. Harris</u>, 526 F.3d 1334, 1337 (11th Cir. 2008) (citation omitted).

As noted, law enforcement officers may also briefly detain individuals for purposes of investigating a crime if they have a reasonable, articulable suspicion based on objective facts that the individual has engaged in, or is about to engage in, criminal activity.  <u>See</u> <u>Terry</u>, 88 S. Ct. 1868; <u>Harris</u>, 526 F.3d at 1337 (same).  "[T]he 'reasonableness' standard requires that a police officer 'be able to point to specific and articulable facts, which, when taken together with rational inferences from those facts, reasonably warrant that intrusion.'"  <u>United States v. Mikell</u>, 102 F.3d 470, 474-75 (11th Cir. 1996) (citing <u>Terry</u>, 88 S. Ct. at 1880).  Additionally, "[d]uring a lawful traffic stop, officers . . . may take steps that are reasonably necessary to protect their personal safety . . ., including requiring the driver and passengers to exit the vehicle

27

'as a matter of course.'" <u>Spoerke</u>, 568 F.3d at 1248 (quoting <u>Maryland v. Wilson</u>, 117 S. Ct. 882, 884 (1997); <u>Pennsylvania v. Mimms</u>, 98 S. Ct. 330, 333-34 (1977)).

The legality of traffic stops is analyzed under the test set forth in <u>Terry</u>. "[A] traffic stop 'must last no longer than is necessary to effectuate the purpose of the stop.'" <u>United States v. Ramirez</u>, 476 F.3d 1231, 1237 (11th Cir. 2007) (quoting <u>United States v. Pruitt</u>, 174 F.2d 1215, 1220 (11th Cir. 1999)). Absent articulable suspicion of other criminal activity, a traffic stop may last no longer than necessary to process the traffic violation. <u>United States v. Purcell</u>, 236 F.3d 1274, 1277 (11th Cir. 2001). Additionally, "'further questioning unrelated to the initial stop is permissible if the initial detention has become a consensual encounter.'" <u>Ramirez</u>, 476 F.3d at 1237 (quoting <u>Pruitt</u>, 174 F.3d at 1220).

In this case, Sgt. Swicord had both probable cause to believe a traffic violation had occurred, following too close in violation of O.C.G.A. 40-6-49, and a reasonable suspicion, based on the information provided by the DEA agents as outlined *supra*, that the tractor-trailer contained evidence of ongoing criminal activity. Sgt. Swicord observed the vehicle which was traveling southbound on I-85, using the left hand lane of the two lane interstate. (Tr. at 33-34, 75). Sgt. Swicord was traveling in the right hand lane slightly behind the tractor-trailer, but he was able to see the vehicles in front

28

of the tractor-trailer.  (Tr. at 34-35, 37).  He observed that the tractor-trailer, which was traveling 65 to 75 miles per hour, was less than two car lengths behind the passenger vehicle in front of it.  (Tr. at 34-35, 76-78).  Because there should be one car length for every 10 miles per hour, the tractor-trailer was following too close, a violation of O.C.G.A. 40-6-49.[16]  (Tr. at 34, 77-78).

And, given the totality of the information known to the sergeant, nothing occurring during the traffic stop unduly prolonged the stop or constituted an unlawful detention of Defendant.  In fact, as he testified (Tr. at 39-40, 50-51, 53), Sgt. Swicord's actions fell within the bounds of a routine traffic stop involving a commercial motor vehicle.[17]  In United States v. Hernandez, 418 F.3d 1206 (11th Cir. 2005), the Eleventh Circuit Court of Appeals, relying on the Supreme Court's decision in Muehler v.

---

[16]In pertinent part, O.C.G.A. 40-6-49 provides:  "(a)  The driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of such vehicles and the traffic upon and the condition of the highway."

[17]Also, Sgt. Swicord conducted the investigative stop in a manner that quickly and diligently confirmed suspicions that Defendant was transporting drug proceeds. (Tr. at 39, 41-47, 50-53).  During the traffic stop, Defendant was not restrained or handcuffed; the tone of the conversation with Defendant was businesslike; the troopers did not draw their weapons or otherwise threaten Defendant.  Only one other trooper was present, for safety, and he stood some distance away and did not participate in the interview.  (Tr. at 48, 50, 52, 58-60).  These facts indicate that the stop was minimally intrusive.  See United States v. Acosta, 363 F.3d 1141, 1144, 1146 (11th Cir. 2004).

Mena, 125 S. Ct. 1465 (2005), stated that the focus in evaluating the reasonableness of a detention during a traffic stop is "on duration (and not scope of questioning). . . ." 418 F.3d at 1209 n.3.  Accordingly, a court does "not inquire as to the substantive reasonableness of the questions that are asked by a police officer in the context of a traffic stop, but only whether the 'duration' of the detention was prolonged 'for an unreasonable time.'"  Ramirez, 476 F.3d at 1237 n.11 (quoting Hernandez, 418 F.3d at 1209 n.3); see also United States v. Ffriend, 151 Fed. Appx. 778, 779 (11th Cir. 2005) ("Moreover, during a legal stop, an officer may ask questions, including questions not strictly related to the traffic stop, while waiting for a computer check of registration or examining a driver's license.").

The duration of a traffic stop may be prolonged to investigate, by the use of computer checks, the driver's license and the vehicle registration and, for officer's safety, the criminal history of the driver.  United States v. Boyce, 351 F.3d 1102, 1106 (11th Cir. 2003)[18]; Purcell, 236 F.3d at 1277-78.  And courts have determined that

[18]However, each of these computer checks must be conducted as a routine part of the traffic stop and not undertaken after the conclusion of the traffic stop to further detain a driver absent articulable suspicion of other criminal activity. Boyce, 351 F.3d at 1107 (finding that the criminal history check in that case was not requested until several minutes after the traffic stop had concluded and after the officer had asked for and been refused consent to search the vehicle).

during routine traffic stops involving commercial tractor-trailers, as part of a normal field interview, officers may obtain and review the bill of lading and log book and other items related to the operation of the truck. See, e.g., United States v. Rodriguez-Alejandro, 664 F. Supp. 2d 1320, 1337 (N.D. Ga. 2009) (finding, as part of traffic stop, that officer was authorized to question the defendant "about his operation of the tractor-trailer, including asking to see his bill of lading and logbook"); United States v. Artiles-Martin, 2008 WL 2600787, at *8 (M.D. Fla. June 30 , 2008) (court found it was "perfectly appropriate to request the Defendant to produce his driver's license, registration, insurance – and because this vehicle was a commercial truck – the driver's medical card and the driver's log book").

Sgt. Swicord, once the troopers and Defendant with the tractor-trailer had relocated to the weigh station, obtained the logbook, permit book, insurance card, CDL, medical card and bill of lading from Defendant. (Tr. at 39). He then examined those documents and noticed several items that led him to believe based on his training and experience that the DEA agents' information about the tractor-trailer transporting contraband, that is, drug proceeds, was correct. See Lindsey, 482 F.3d at 1290-91 ("We also recognize that the police may 'draw on their own experience and specialized training to make inferences from and deductions about the cumulative information

31

available to them that might well elude an untrained person.'") (citation omitted); United States v. Smith, 201 F.3d 1317, 1323 (11th Cir. 2000) ("In deciding whether the detaining officers had reasonable suspicion, we look at the totality of the circumstances known to the detaining officers at the time of the detention[,]" which includes viewing all of the circumstances "in the light of the officers' special training and experience.").

Sgt. Swicord examined the last seven days documented in the logbook and noted that before making the trip from Laredo, Texas, Defendant had taken several days off, which is not normal operating procedure. (Tr. at 40-41). Having also noted that the trucking company was fairly new due to the high D.O.T. number and was small, operating only three trucks, the time off was especially suspicios to the sergeant because the truck must be in operation for the company - and Defendant, who received a commission on the loads transported - to make any money. (Tr. at 41-42, 49, 82, 84). And, while examining the logbook, Sgt. Swicord noted that Defendant had not noted any stops in Atlanta, although the sergeant was aware from the agents that Defendant had stopped at the warehouse. (Tr. at 46). Defendant only noted a stop for fuel in Carnesville, near Toccoa, Georgia, on I-85. Based on the normal trip time from that location to the point of the traffic stop, Sgt. Swicord estimated that approximately four hours was not accounted for in the logbook. (Tr. at 46, 79-80). When Sgt. Swicord

32

asked Defendant about the delay, Defendant did not advise that he stopped in Atlanta, and he had no explanation for the extra travel time. (Tr. at 47, 80). Because Defendant could be penalized with ten hours off for failing to document all stops, Sgt. Swicord stated that this "lends credence to he knows he was doing something he shouldn't be doing, that's the reason that he didn't write it down there." (Tr. at 49). And Defendant's lack of honesty with the sergeant contributes to a finding of probable cause. See United States v. Howard, 991 F.2d 195, 201-02 (5th Cir. 1993) (based on all the facts known to the officers, which included the defendant's lies about ownership of the vehicle in question, there was probable cause for a search of the vehicle); United States v. Koshnevis, 979 F.2d 691, 695 (9th Cir. 1992) (finding that defendant's inconsistent statements about ownership of the vehicle and his lie that he did not have a key for the vehicle's trunk, along with other factors, established probable cause for a search of the vehicle's trunk).

In addition to the concerns raised by the logbook, the information he observed on the seal and bill of lading added to the sergeant's suspicions indicating that, after the trailer had left Smithfield where it was loaded with pork hams (Tr. at 42), the trailer was opened and then resealed. Sgt. Swicord  observed a number of inconsistencies

33

from normal operating procedures.[19]  As the trailer is loaded, the dock supervisor and driver typically watch the loading, and at Smithfield, a computer-generated seal is placed on the bill of lading and on the trailer.  (Tr. at 43-44).  On the bill of lading produced by Defendant, the computer-generated seal from the loading dock was marked through with an ink pen and a handwritten seal placed above it.  (Tr. at 44).  On the trailer, a "generic seal,  . . . a keller seal, had been placed on there."  That type of seal can be purchased at any truck stop.  And the seal is not used by Smithfield.  (Tr. at 44).  Based on these observations, Sgt. Swicord believed that someone had been inside the trailer since it left the Smithfield loading dock.  (Tr. at 44).

Also, as Sgt. Swicord discussed these observations with Defendant, Defendant became nervous - Sgt. Swicord believed due to the fact that Defendant was not providing a legitimate explanation about the seal or his travel.  (Tr. at 48).  Finally, the sergeant noticed that the trailer doors had been locked with a  titanium bolt seal which would require bolt cutters to remove and would prevent a law enforcement officer without bolt cutters from getting into the trailer.  (Tr. at 45).  The traffic stop lasted approximately thirty minutes.  (Tr. at 53).

---

[19]This was a fairly common load for interstate transportation, and Sgt. Swicord had conducted hundreds, if not thousands, of traffic stops involving commercial motor vehicles transporting these loads.  (Tr. at 42).

34

The totality of the information known to the DEA agents, in addition to the information developed during the lawful traffic stop by Sgt. Swicord which confirmed that information, established probable cause that the trailer contained evidence of a crime, drug proceeds. See United States v. Rodriguez, 664 F. Supp. 2d 1320, 1339-40 (N.D. Ga. 2009) (finding that the wiretap intercepts detailing the transactions to take place, the use of coded language referring to the drug trade, the prior surveillance and seizures under similar circumstances, and the surveillance of the vehicle in question established probable cause for the search of the vehicle following the traffic stop) (citing United States v. Olvera, 178 Fed. Appx. 373, 374-75 (5th Cir. 2006) (*per curiam*) ("finding wiretap surveillance and observations of suspect provided agents with probable cause to search the vehicle, including any area where contraband could be found"); United States v. Pineda, 2008 WL 686239, at **10-11 (N.D. Ga. March 10, 2008 ("finding collective knowledge of officers conducting wiretap surveillance of drug trafficking organization followed by the observations of defendant actually engaging in activity expressed during the intercepted calls gave officers sufficient probable cause to search vehicle"); Jackson, 548 F. Supp. 2d at 1320-21 ("probable cause to search vehicle existed based on the information learned through the wiretap and earlier surveillance confirming information"); United States v. Lee, 2007 WL

35

1567098, at **11-12 (E.D. Tex. May 29, 2007) ("agents' knowledge, provided by intercepted calls, that truck drivers in tractor-trailers were utilized as couriers to distribute narcotics, coupled with agents' observation of duffle bags being placed in truck with call afterwards confirming 'everything was cool,' provided sufficient probable cause to believe defendant was transporting cocaine")); United States v. Longoria, 2009 WL 3366016, at *8 (N.D. Ga. October 15, 2009) ("The investigation in this case, including the intercepted calls detailing the transaction to take place, the description of the participants, the location, and the vehicle involved, and the time designated for the transaction coupled with the agents' observations confirming the information obtained from those calls 'gives rise to a probable cause belief that contraband [would be] present in the vehicle'") (citation omitted).

Based on this probable cause, Sgt. Swicord could search the tractor-trailer and any containers therein capable of hiding the drug proceeds.  The Eleventh Circuit Court of Appeals in United States v. Fernandez Martinez, 317 Fed. Appx. 929 (11th Cir. 2009), stated, "If police have probable cause to believe a container containing contraband will be found in a car, then the police may search the car for the container without a warrant."  Id. at 935; see also Wyoming v. Houghton, 119 S. Ct. 1297, 1301 (1999) ("'If probable cause justifies the search of a lawfully stopped vehicle, it justifies

36

the search of *every part of the vehicle and its contents* that may conceal the object of the search.'") (citation omitted) (emphasis in original); <u>United States v. Mathis</u>, 239 Fed. Appx. 513, 515 (11th Cir. 2007) (same).  After Sgt. Swicord cut the bolt on and opened the trailer doors, he climbed in.  Because of the refrigeration, there was a light frost on the boxes of pork hams.  (Tr. at 61-62).  Sgt. Swicord examined the top of the boxes with a flashlight and observed knee marks and footprints in the frost.  Given the industry practice for loading the boxes from the front of the trailer to the back, there was no reason for anyone to have been on top of the boxes; therefore, added to the fact that the seal had been cut, he believed that contraband had been inserted into the legitimate load of pork hams, just as he had seen in prior cases.  (Tr. at 62).  After crawling over the boxes, Sgt. Swicord did not see anything stuffed among the boxes but did observe that about mid-way to the front of the load the knee marks and footprints stopped.  (Tr. at 63).  Because the 680 boxes were mashed together and extremely heavy, banded and sealed, it was not possible to examine each box at the weigh station.  He needed a forklift and pallet jack.  (Tr. at 62-64).

After Sgt. Swicord explained to Defendant what he had observed in the trailer, he asked Defendant to follow the troopers to the WalMart Supercenter, which had a loading dock, so that they could quickly and efficiently remove and examine the load

37

without any spoilage. (Tr. at 62, 64-66). Defendant drove the tractor-trailer to the WalMart and backed the trailer up to an open loading dock. (Tr. at 66). The sergeant advised Defendant that he would unload and check the boxes as quickly as possible and that he would document on the bill of lading that he had inspected the load and then would reseal the load. Sgt. Swicord unloaded the boxes of pork hams from the trailer and examined each box. (Tr. at 66-68; Gov't Exs. 8 and 9). All of the boxes except one had an ink mark and a Smithfield receipt tape. When the sergeant examined the opening in the box, used as a handle, he observed bundled packages, which based on his experience, he knew contained U.S. currency. (Tr. at 68). There were thirty-seven $20,000 bundles of U.S. currency. (Tr. at 68; Gov't Ex. 10). The search conducted by Sgt. Swicord did not exceed the scope of the probable cause established to believe drug proceeds were contained in the trailer. The search was lawful, and the seizure did not violate Defendant's Fourth Amendment rights.

The court will not address in detail Defendant's argument that he did not have authority to consent to a search of the trailer but notes that the fact another person owned the trailer or the commodity loaded on the trailer is not dispositive of the issue of Defendant's apparent authority to consent to the search. See United States v. Matlock, 94 S. Ct. 988, 993 n.7 (1974). Contrary to Defendant's assertion, the bolt on

38

the trailer's rear door did not indicate to Sgt. Swicord that Defendant did not have authority to enter the trailer but, instead, that this was an attempt to keep law enforcement officers, who may not have bolt cutters with them, out of the trailer. (Tr. at 45). The record is silent as to whether Defendant had a means to unlock or remove the bolt. Also, given the totality of the information known to Sgt. Swicord, including that Defendant had stopped en route and allowed third parties to enter the trailer to off-load the tomatoes and to load the pork hams and drug proceeds (Tr. at 7-15, 32, 41-44, 46-47), evidenced sufficient control by Defendant over the trailer to authorize consent to the search. In light of binding Eleventh Circuit Court of Appeals authority that "a third party in sole possession and control of a vehicle clearly has the authority to consent to its search[,]" United States v. Dunkley, 911 F.2d 522, 526 (11th Cir. 1990), and without any information having been provided to Sgt. Swicord *prior*[20] to the search evidencing lack of authority by Defendant to consent, the consent was valid. See also United States v. Jenkins, 92 F.3d 430, 437-38 (6th Cir. 1996) (reasonable for trooper to assume that driver of tractor-trailer rig had authority to consent to search). Finally, the record before the court satisfies the Government's burden of establishing that

---

[20]Defendant did not disclaim interest in the currency until after the search was completed. (Tr. at 66-70; Gov't Ex. 5).

Defendant's consent was voluntary.  (Tr. at 53-60; Gov't Exs. 3 and 4).  See United States v. Blake, 888 F.2d 795, 798 (11ᵗʰ Cir. 1989).

**III.    Conclusion**

For the foregoing reasons and cited authority, the court **RECOMMENDS** that Defendant's motion [Doc. 38] to suppress be denied.

There are no other pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case.

**IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be and the same is hereby, declared Ready for Trial as to Defendant Isaias Refugio Rodriguez.

**SO RECOMMENDED** this 23ʳᵈ day of September, 2011.

JANET F. KING
UNITED STATES MAGISTRATE JUDGE

40